UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| DAVID C. WILEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | No. 4:15 CV 590 DDN |
| | ) | |
| CAROLYN W. COLVIN, | ) | |
| Acting Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## MEMORANDUM

This action is before the court under 42 U.S.C. § 405(g) for judicial review of the final decision of the defendant Commissioner of Social Security denying the application of plaintiff David C. Wiley for disability insurance benefits (DIB) under Title II of the Social Security Act. For reasons set forth below, the final decision of the Commissioner is affirmed.

## I. BACKGROUND

Plaintiff was born on September 9, 1959. (Tr. 135.) He filed his Title II application for disability insurance benefits on February 14, 2012, alleging disability beginning November 1, 2011. (Tr. 17, 35.) He subsequently amended his alleged onset date to December 2, 2011. (Tr. 17, 149.) His alleged disabling impairments are seizures and sleep apnea. (Tr. 154.) Plaintiff's application was denied initially, and he requested a hearing before an administrative law judge (ALJ). (Tr. 17.)

On September 13, 2013, following a hearing, the ALJ issued a decision unfavorable to plaintiff. (Tr. 17-26.) The Appeals Council denied plaintiff's request for review. (Tr. 1.) Thus, the decision of the ALJ stands as the final decision of the Commissioner.

## II. MEDICAL AND OTHER HISTORY

On December 8, 2010, plaintiff visited SLUCare and was seen by Bingzhong Chen, M.D., for treatment following a seizure. At that time he was diagnosed with complex partial seizure disorder, right ear tinnitus, and sleep apnea. (Tr. 210-12.)

On December 2, 2011, plaintiff visited People's Health Center (PHC) and was seen by Mariea Snell FNP (Family Nurse Practitioner). Plaintiff's chief complaint during the visit was seizures, memory loss, and blank mind episodes. Plaintiff was observed as having his memory intact and no sensory loss, and his deep tendon reflexes were preserved and symmetric. PHC diagnosed plaintiff with hypertension, localization-related (focal) (partial) epilepsy, and sleep apnea. (Tr. 226-28.)

On January 13, 2012, plaintiff visited the Washington University School of Medicine Multidisciplinary Sleep Medicine Center, where he was seen by Darla Darby, D.O. There he was assessed with a history of obstructive sleep apnea (OSA) syndrome. Dr. Darby noted plaintiff's OSA had not been treated for about 3.5 years and he was eager to resume treatment with the continuous positive airway pressure system (CPAP). Further, plaintiff was diagnosed with complex partial seizures which were poorly controlled with Tegretol. The treatment plan included beginning Zonegram 100 mg daily and increasing by 100 mg per week until 400 mg daily. (Tr. 234-36.)

On January 26, 2012, plaintiff visited Washington University for an 18 channel digital extended video EEG. The test results, interpreted by Dr. Darby, were abnormal due to right temporal sharp waves and left temporal slowing. The report further noted, "[t]he described sharp waves are typically seen in patients who have a history of focal onset seizures. The described left temporal slowing indicates regional cerebral dysfunction in the left hemisphere." (Tr. 242.) That day plaintiff also underwent a diagnostic polysomnogram with continuous positive airway pressure titration. The test result was evidence of severe OSA. A CPAP machine was noted as an effective treatment for plaintiff's OSA. (Tr. 243-44.)

On March 23, 2012, plaintiff visited St. Louis Connect Care (Connect Care) and was seen by Earl Schultz, M.D., his chief complaint being seizures. Dr. Schultz noted

that plaintiff complained of seizures, staring spells, poor memory, ringing in his ears, and vertigo at times over the past several weeks. Plaintiff could not remember if he had an MRI or other imaging. Assessment of plaintiff was that he suffered from seizure disorder. Dr. Shultz's plan was to order laboratory studies and an EEG. (Tr. 270-73.)

On April 10, 2012, plaintiff visited Washington University and was seen by Amy Licis, M.D., for a neurological exam. The assessment of plaintiff's mental status was that he was "alert, oriented, [with] normal spontaneous fluent speech with full comprehension." The records indicated plaintiff had complex partial seizures. (Tr. 237-39.)

On April 16, 2012, plaintiff visited Barnes Jewish Hospital (BJH) Neurodiagnostics and underwent a routine 32 channel EEG. The interpretation of findings, by Lawrence N. Eisenman, M.D., Ph.D., showed no focal, lateralized, or epileptiform abnormalities resulting in a normal awake and stage I and II sleep EEG. (Tr. 247.)

On May 25, 2012, plaintiff visited Connect Care again and was seen by Morvarid Karimi, M.D. Since his last visit plaintiff had one seizure and was found on the ground, with mouth injuries to his cheeks and tongue, bladder incontinence, and had postictal dysarthria[1] that ended later that day. On the same day, Dr. Karimi's review of systems showed tinnitus and nasal passage blockage, but no sign of vertigo or memory lapse or loss. The plaintiff was assessed with epilepsy and recurrent seizures. Dr. Karimi prescribed Tegretol XR 200 mg and sertaline HCL 25 mg. Plaintiff was to begin taking a titrating dose of sertaline, beginning at 25mg increasing to 100mg. (Tr. 266-69.)

On July 18, 2012, plaintiff visited BJH and was under the care of Eric John Huselton, M.D. Plaintiff stated seizures began seven years ago, but the first four years were well controlled on 200 mg of carbamazepine. Plaintiff now reports having 1-2

---

[1] Dysarthria is a motor speech disorder. It results from impaired movement of the muscles used for speech production, including the lips, tongue, vocal folds, and/or diaphragm. American-Speech-Language Assoc., Disorders and Diseases, http://www.asha.org/public/speech/disorders/dysarthria/.

3

seizures a week, although he was still taking his carbamazepine every day. Further, plaintiff complains of a worsening memory and a buzzing in his head. Lastly, plaintiff's OSA was well controlled with the use of CPAP. Also on July 18, 2012, plaintiff underwent a health risk screening, revealing he has memory problems after seizures and some difficulty with activities of daily living where his family assists as needed. (Tr. 389-92.)

On September 20, 2012, during a visit to BJH, records indicate plaintiff has a history of epilepsy, OSA, a mass removal from his nasal ridge, tinnitus, and a popping sensation in his ear. Plaintiff complained to Kevin Patel, M.D., of having no memory of entire trips that he has taken, no memory of having a mass removed from his nasal ridge, occasionally getting lost on walks, and being unable to tell his wife how long they had been married. Plaintiff complained that the ringing in the ears and popping sensation have caused him to discontinue the CPAP treatment. Dr. Patel referred plaintiff to the Ear Nose and Throat Clinic (ENT). (Tr. 379-82.)

On September 28, 2012, plaintiff underwent an MRI, requested by Dr. Patel and interpreted by Aseem Sharma, M.D., on his brain and brain stem. The MRI report revealed a partial empty sella,[2] but otherwise a normal brain MRI without imaging evidence to explain the plaintiff's seizures. (Tr. 373-74.)

On October 10, 2012, plaintiff followed up with BJH. His seizures were being handled by the neurology department, but the brain MRI and a routine lab test were negative. BJH decided he should continue with Tegretol and defer to the neurology department regarding continuing titration. As for the OSA, plaintiff stated the CPAP makes his tinnitus worse and prevents him from sleeping. He was, at that time, scheduled an ENT appointment to evaluate his tinnitus. (Tr. 369-70.)

---

[2] Empty sella syndrome is a condition in which the pituitary gland shrinks or becomes flattened. The pituitary gland is a small gland located at the base of the brain. It sits in a saddle-like compartment in the skull called the sella turcica. In Latin, it means Turkish saddle. NIH, U.S. National Library of Medicine, Medical Encyclopedia (Mar. 3. 2016), https://www.nlm.nih.gov/med lineplus/ency/article/000349.htm.

On October 22, 2012, plaintiff visited the ENT department and was seen by Shaun Desai, M.D. A history of epilepsy, OSA, mass removal from his nasal ridge, tinnitus, and popping sensation of his ears were noted. ENT's assessment of plaintiff's active problems was epilepsy and recurrent seizures, eustachian tube block, and OSA. ENT ordered a neck computed tomography (CT) with contrast and an audiogram, and noted that there will likely be a need for a nasal endoscopy and lesion biopsy. On October 30, 2012, plaintiff underwent an audio evaluation and CT with contrast in his neck. At that time, plaintiff complained of tinnitus in both ears. The CT was assessed and revealed no abnormalities. (Tr. 362-63.)

On January 15, 2013, Dr. Patel of BJH noted his review of plaintiff's paraneoplastic panel. Dr. Patel stated that plaintiff's potassium channel antibody is positive at a level 6-7 times the upper limit of normal. Further, Dr. Patel was concerned that plaintiff was experiencing limbic encephalitis which could produce an epilepsy emanating from the temporal lobes, as was noted on his prior EEG, and could give rise to a progressive memory deficit as plaintiff had previously reported. (Tr. 307.)

On February 11, 2013, plaintiff admitted himself to BJH for a planned procedure to have a mass removed from his chest by surgeon Traves Dean Crabtree, M.D. The principal and secondary diagnoses were moderate-size anterior mediastinal mass, concern for possible thymoma[3] or teratoma, and recurrent seizure disorder. He remained in the hospital for six days after the operation. The postoperative diagnosis was a moderate size anterior mediastinal mass with concern for possible thymoma or teratoma. (Tr. 403, 418.)

---

[3] A thymoma is a tumor that arises in the thymic gland, an organ that resides under the breastbone on top of the heart and great vessels. Keck School of Medicine (USC), Department of Surgery, Thymoma. *See* http://www.surgery.usc.edu/thoracic/thymoma.html.

On March 18, 2013, plaintiff was admitted into BJH for scheduled immunomodulatory[4] therapy under the care of Robert Bucelli, M.D. Plaintiff's chief complaints were seizures and memory loss. During the examination, plaintiff's wife stated that she was monitoring his Tegretol to ensure correct dosage and plaintiff had not had any seizures since the hospitalization in February of 2013. During discharge on March 27, 2013, plaintiff's neurologic condition was described as "alert and oriented" as well as having a recall memory of 3/3 at zero minutes and 2/3 at five minutes with prompting. Dr. Bucelli noted that plaintiff "clearly has large gaps in his memory," not being able to recall two surgeries in the past two years. (Tr. 450-51.)

On April 15, 2013, plaintiff was seen at BJH. During the visit, Dr. Huselton completed a Medical Source Statement (MSS) assessment. The findings were as follows: (1) plaintiff's current diagnoses were seizure disorder and autoimmune limbic encephalitis; (2) plaintiff's symptoms and recommended treatment can be summarized as seizures, memory impairment with a prescription for Prednisone and Tegretol; (3) plaintiff has memory impairment that would impair his ability to maintain attention and concentration, and to make decisions; and (4) plaintiff is unable to engage in full time employment because of his impaired memory, seizure disorder, and inability to maintain focus and would be unable to work with machinery, heights, etc. because of his seizures. (Tr. 484-85.)

On May 14, 2013, plaintiff moved to amend the alleged onset date of disability to December 2, 2011. (Tr. 149.) Also, on May 14, 2013, the hearing before the ALJ was held. At the request of the ALJ at the hearing, plaintiff was referred for a psychological evaluation.

---

[4]An Immunomodulator is a chemical agent (such as methotrexate or azathioprine) that modifies the immune response or the functioning of the immune system (by stimulating antibody formation or the inhibition of white blood cell activity). Immuno-modulator, Merriam Webster Dictionary. http://www.merriam-webster.com/dictionary/immunomodulator.

**ALJ Hearing**

On May 14, 2013, a video hearing was held. The plaintiff and his wife, Laura Wiley, appeared in St. Louis, Missouri and the hearing was presided over from Chicago, Illinois. The plaintiff was 52 years old at the time of the hearing. He was 5 feet 5 inches tall and weighed 213 pounds. He lived with his wife and stepdaughter who both had jobs that brought income into the house. His last job was driving a forklift in 2010 when he was fired because his health problems became a safety issue. He filed and received unemployment for a total of one year and never received any workers compensation. (Tr. 33-38.)

Plaintiff testified to the following. Plaintiff is unable to work because of his seizures, not being competent, and anxiety. His seizures come on without warning and he feels drained afterwards like he just got through running in the park. He has no memory of what his body is doing during the seizure. The draining feeling lasts about 15 to 20 minutes, at which point he just sits back and rests. (Tr. 38-39.)

Plaintiff has memory problems. He is not able to recall movies he has seen with his wife, and when his brothers call and check up on him. In March of 2013, he was admitted to the hospital to undergo infusions. He does not feel he has improved since he has been released from the hospital. (Tr. 39-41.)

Plaintiff was on 70 milligrams of Prednisone a day. His side effects from that medication include weight gain. He worked for Fed-Ex and Unisource at the same time. He operated a forklift at Unisource for 25 years. He started having problems at Unisource, while interacting with his co-workers. He was accused of jumping off of the machine and charging a fellow worker. Another incident occurred when he ran into a steel beam. He has altercations or verbal fights with both family and friends and tries to stay aware of his attitude now that he knows he has a problem with it. (Tr. 41-44.)

Plaintiff was diagnosed with sleep apnea. He was given a CPAP machine to use, but there are times he has not used it because he is not able to breathe while using it. He was involved in a sleep study where he learned he was not able to reach the third level of

sleep, described to him as a "deep sleep." He has resumed the use of the CPAP machine and has felt pretty good in the mornings. (Tr. 44-45.)

Plaintiff has constant ringing in his ears, which is considered tinnitus episodes, and he experiences vertigo. He had constant ringing in his ears during the hearing and it is hard for him to ignore. His vertigo episodes last 15 to 20 minutes and go away on their own after he sits down. These vertigo episodes sometimes occur three to four times a day. Plaintiff's symptoms of vertigo are dizziness or a lack of concentration. Plaintiff also has a loss of bladder control after seizures. (Tr. 45-47.)

Plaintiff is not able to drive and once became lost on a walk to the park. He usually gets up around 5:30 a.m. and then wakes his daughter. He is able to bathe and dress on his own, but was once found on the floor of the shower by his daughter. He no longer cooks, but does try and help with dishes. He does not visit friends or relatives, and if he does go anywhere, it is with his wife. He volunteers with his church two days a week. He once had a seizure during his bible study. (Tr. 48-50.)

Plaintiff experiences anxiety when he sees things that he used to do with ease and no longer can do. He has not had any alcohol for about four years. He quit because the alcohol did not agree with him. (Tr. 51-52.)

Plaintiff's wife testified that during plaintiff's seizures his face becomes distorted, he smacks his lips, he moves his arms, and he is non-responsive to anything said to him. The seizures last 10 to 15 minutes. Upon reaching their maximum, they taper down. He remains confused for 15 to 20 minutes after a seizure. Since he began "immuno therapy," Ms. Wiley observed three seizures. (Tr. 56.) Plaintiff remembers very little, his short term memory being the worst. For example, he will not remember a conversation he had the day before. (Tr. 54-57.)

Ms. Wiley further testified that plaintiff's personality has become irritable and he is less social around groups of people. He has trouble staying on task which causes him to take "a while" to finish a task. His memory causes him to forget to take his medication. His wife now puts his medication in a daily pill box and monitors the dosage very closely. His memory has not improved, but he does seem more alert. However, he

8

has still gotten lost on several occasions. For example, at the grocery store, he was sent down an aisle to retrieve an item and had gotten lost to the point he had to be found. (Tr. 57, 59-60.)

The ALJ asked Ms. Wiley to clarify her observations of plaintiff's three seizures since the plasma treatment. She stated "[h]e's had three in April alone." The ALJ referenced the two EEG tests and the brain MRI to be clarified by the attorney.

The ALJ then considered the testimony of vocational expert Michelle Peters Fagel (VE). (Tr. 61-63.) The ALJ noted that plaintiff had an excellent work history. The ALJ and plaintiff's counsel asked the VE several hypothetical questions. First, the ALJ asked the VE to consider someone plaintiff's age, with a high school education, who could lift 20 pounds occasionally and 10 pounds frequently, who could stand and sit for 6 hours out of an 8 hour workday, but who could not work on ladders, at heights, or around moving parts. The VE testified that, with those assumptions, plaintiff could not perform his past work of a receiving clerk, which was characterized as having a skill level of five and requiring medium physical ability. (Tr. 63-69.) However, the VE testified that there are other jobs that someone of the same age, education, and work experience as the plaintiff, could perform. The hypothetical person could perform the work of "cashier, unskilled, light."

The ALJ proposed a second hypothetical person the same as the first, but adding one unscheduled rest break per day for 30 minutes each. The VE testified no job could be performed on a fulltime, competitive basis under this hypothetical. (Tr. 65.)

Plaintiff's counsel proposed a hypothetical individual who would be off task once per month due to a seizure that lasted 15 minutes plus another 10 to 15 minutes to recover. The VE testified that, if an individual is off task, unscheduled, one time a month, this would be seen more as an accommodation than competitive work.

The ALJ then asked the VE if there were jobs for this hypothetical person who would need to be off task 30 minutes per month. The VE responded that, in her professional opinion, if the 30 minute break occurred month after month consistently, no

9

jobs existed for that person to be able to sustain employment in a competitive work environment. (Tr. 66-68.)

At the end of the hearing, the ALJ stated he would refer plaintiff for a consultative examination to aid in resolving inconsistencies. Specifically, the ALJ stated the consultative examination would be a mental exam regarding plaintiff's "memory issues." (Tr. 70.)

On June 18, 2013, plaintiff underwent the consultative examination, referenced by the ALJ. On July 5, 2013, psychologist Paul W. Rexroat, Ph.D., completed his Psychological Evaluation Report. (Tr. 499-505.) Among his factual findings, Dr. Rexroat reported that plaintiff was well oriented for person, place, and situation. Regarding plaintiff's memory, Dr. Rexroat stated:

> He said it was Monday in June 2013 when it was Tuesday, June 18, 2013. Memory for events in his past was fair. Immediate memory, as measured by digit span, was 4 digits forward and 3 digits backward. Delayed memory, as measured by asking him to identify 3 objects in the office after a 5 minute time period was 3/3. So far as recent memory was concerned, when asked what he had for breakfast, Mr. Wiley said he ate a bowl of Raisin Bran cereal. Regarding his remote memory, he was able to state the place and date of his birth. He was able to identify Barack Obama as the current president and the only past president he was able to name was Reagan. When asked to identify four large cities in the United States, he said Atlanta, Kansas City, and New York.
> * * *
> Mr. Wiley is able to understand and remember simple instructions. He can sustain concentration and persistence with simple tasks. He can interact socially. He has mild limitations in his ability to adapt to his environment.
> * * *
> Mr. Wiley was able to sustain concentration, persistence, and pace with simple tasks. Memory functioning appears to be in the borderline range which would cause him to have moderate limitations in his abilities to recall previously learned information and to remember new information.

(Tr. 500-02.)

Dr. Rexroat also filled out a Medical Source Statement of Ability To Do Work-Related Activities (Mental). He found that plaintiff had no limitation on his ability to understand and remember simple instructions and to carry out simple instructions.

Plaintiff was mildly limited in his ability to make judgments on simple work-related decisions. However, Dr. Rexroat found that plaintiff had marked limitations in his ability to understand and remember complex instructions, to carry out complex instructions, and to make judgments on complex work-related decisions. Dr. Rexroat determined that plaintiff's "estimated borderline intelligence would cause these limitations." (Tr. 503.)

### III. DECISION OF THE ALJ

On September 10, 2013, the ALJ issued a decision that plaintiff was not disabled within the meaning of the Social Security Act from December 2, 2011, through the date of the decision. The ALJ found the plaintiff: (1) had not engaged in substantial gainful activity (SGA) since the alleged onset date; (2) has a severe impairment of limbic encephalitis with seizures; (3) does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments in 20 C.F.R. Part 404, Subpart P, Appendix 1 (20 C.F.R. § 404.1520 and § 404.1525); and (4) has a residual functional capacity (RFC) to perform light work as defined in 20 C.F.R. § 404.1567(b), except he can never climb ladders, operate heavy machinery, or work near hazards. (Tr. 19-21.)

Further, the ALJ decided that plaintiff could not perform any of his past relevant work. However, considering plaintiff's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that the plaintiff can perform, according to 20 C.F.R. § 404.1569 and § 404.1569(a). (Tr. 25.)

### IV. GENERAL LEGAL PRINCIPLES

The court's role on judicial review of the Commissioner's decision is to determine whether the Commissioner's findings comply with the relevant legal requirements and are supported by substantial evidence in the record as a whole. Pate-Fires v. Astrue, 564 F.3d 935, 942 (8th Cir. 2009).

The court must affirm the Commissioner's decision, if it is supported by substantial evidence on the record as a whole. Bernard v. Colvin, 774 F.3d 482, 486 (8th

Cir. 2014). Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion. Id. On review, both evidence that detracts from and supports the Commissioner's decision must be evaluated; and, if two inconsistent conclusions from the evidence emerge and one is representative of the Commissioner's, the court must affirm the decision of the Commissioner. Id. The court may not reverse merely because substantial evidence exists in the record that would support a contrary outcome or because the court would have decided the case differently. See Krogmeier v. Barnhart, 294 F.3d 1019, 1022 (8th Cir. 2002).

To be entitled to disability benefits, the claimant must be unable to engage in any SGA by reason of any medically determinable physical or mental impairment which has lasted a continuous period of not less than twelve months. Id. Disability is determined according to a five-step process, considering whether the claimant: (1) was or is engaged in SGA; (2) is severely impaired; (3) has an impairment or comparable impairment on the Commissioner's List of presumptively disabling impairments; (4) could perform his past relevant work; and if not, (5) could perform any other kind of work that exists in significant numbers in the national economy. See 20 C.F.R. § 404.1520(a); see also Pate-Fires, 564 F.3d at 942 (describing five-step process); Bernard, 564 F.3d at 486 (same).

At Step Four, the claimant bears the burden of demonstrating he is no longer able to return to his past relevant work. If the claimant is successful at this step, the burden shifts to the Commissioner at Step Five to show the claimant retains the RFC to perform other work that exists in significant numbers in the national economy. Pate-Fires, 564 F.3d at 942; see 20 C.F.R. § 416.920(a)(4)(v).

## V. DISCUSSION

Plaintiff argues: (1) the ALJ failed to properly consider his RFC; (2) the ALJ failed to properly consider all of plaintiff's severe impairments at Step Two; (3) the ALJ failed to properly consider the issue of his failure to follow prescribed treatment; and (4) the decision of the ALJ is contrary to the weight of the evidence currently of record.

**(1) Residual Functioning Capacity and Credibility**

Plaintiff contends the RFC found by the ALJ is not supported by substantial evidence. More specifically, plaintiff contends the ALJ failed to properly consider the effects of memory loss associated with limbic encephalitis on RFC.

RFC is a medical question and the ALJ's determination of RFC must be supported by substantial evidence in the record. Hutsell v. Massanari, 259 F.3d 707, 711 (8th Cir. 2001); Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001); Singh v. Apfel, 222 F.3d 448, 451 (8th Cir. 2000). RFC is what a claimant can do despite his limitations, and it must be determined on the basis of all relevant evidence, including medical records, physician's opinions, and a claimant's description of his limitations. Donahoo v. Apfel, 241 F.3d 1033, 1029 (8th Cir. 2001); see 20 C.F.R. § 404.1545. While the ALJ is not restricted to medical evidence alone in evaluating RFC, the ALJ is required to consider at least some evidence from a medical professional. Lauer, 245 F.3d at 704. An "RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts (e.g., laboratory findings) and nonmedical evidence (e.g., daily activities, observations)." SSR 96-8p, 1996 WL 374184, at *7 (1996).

In this case, the ALJ determined that plaintiff retained the RFC to perform light work as defined in 20 C.F.R. § 404.1567(b), except he can never climb ladders, operate heavy machinery, or work near hazards. (Tr. 22, 25.) The ALJ concluded that plaintiff's mental examination showed some deficits in remote memory and these deficits would preclude his ability to perform complex or multi-step actions in a work environment. (Tr. 24, 503.) However, the ALJ stated there is nothing in the record to suggest plaintiff would not be able to perform simple, routine, and repetitive unskilled work. (Tr. 24.)

Plaintiff argues the ALJ failed to properly consider the effects of memory loss associated with limbic encephalitis on RFC. The record included substantial evidence that memory loss, about which plaintiff complains, would not interfere with his ability to perform simple, routine, and repetitive unskilled work. In addition, the ALJ considered memory loss associated with limbic encephalitis, when assessing plaintiff's RFC. The

13

ALJ's opinion relied on the opinions of Dr. Patel, Dr. Hueslton, and Dr. Rexroat. (Tr. 19-25.)

In determining plaintiff's RFC, the ALJ accorded little weight to the opinions of Dr. Patel. (Tr. 23.) The ALJ stated that on May 9, 2013, Dr. Patel opined that plaintiff was limited in his ability to function and "needed to rest as needed," which would limit his ability to work a full workweek. (Id.) However, Dr. Patel's opinion actually was misstated by the ALJ. (Compare Tr. 23 with Tr. 492.)[5] Even though the ALJ accorded Dr. Patel's opinion very little weight, Dr. Patel's actual opinion supports the ALJ's finding. Dr. Patel actually opined that plaintiff could work a full workweek. (Id.) Furthermore, Dr. Patel stated that plaintiff was able to "stand, walk, or sit without any limitations but that he could only occasionally climb, balance, stoop, crouch, crawl, or kneel and that he must be able to take breaks as needed." (Tr. 23, 491-93.)

Plaintiff argues that on July 25, 2013, Dr. Patel reported that plaintiff complained of significant memory problems, which plaintiff argues detracts from the ALJ's RFC finding. (Tr. 524.) However, the medical record contains reports of memory lapses and reports of no memory lapses. (e.g., Tr. 267 ("no memory lapses or loss"), 307 (noting plaintiff's report of progressive memory deficit), 379 (report of loss of memory for events), 389 (plaintiff reports worsening memory), 500-01 (report of memory causing moderate limitations).) The ALJ's assessment of Dr. Patel's findings did not prejudice plaintiff.

The ALJ accorded some weight to the parts of Dr. Huselton's findings that were consistent with the record as a whole. (Tr. 23.) Dr. Huselton's assessment on April 15, 2013, that plaintiff remained capable of performing the physical requirements of all work, but must avoid heights and moving machinery is consistent with the record as a whole. (Tr. 485.) Dr. Huselton opined that plaintiff's seizure disorder and impaired memory would limit plaintiff's ability to maintain focus throughout the day. (Id.) Plaintiff failed to undergo neuropsychiatric testing to determine the extent to which his memory is

---

[5] Dr. Patel reported that plaintiff was limited in his ability to function and would rest as needed, but this would not limit his ability to work a full workweek. (Tr. 492.)

affected by his limbic encephalitis. (Tr. 23.) Dr. Huselton's objective findings coupled with plaintiff's failure to adhere to Dr. Huselton's request of undergoing testing, support the ALJ's determination of RFC. Lastly, Dr. Huselton, in his professional opinion, concluded that plaintiff was unable to work full time. (Tr. 483-85.) The ALJ has full discretion in findings as to the ultimate issue whether the plaintiff is disabled. See 20 C.F.R. § 404.1527(d)(1); see also Wagner v. Astrue, 499 F.3d 842, 849 (8th Cir. 2007) (the ALJ "need not adopt the opinion of a physician on the ultimate issue of a claimant's ability to engage in substantial gainful employment") (quoting Qualls v. Apfel, 158 F.3d 425, 428 (8th Cir. 1998)). Substantial evidence supports the ALJ's RFC determination taking into account memory issues, and the ALJ was entitled to discount Dr. Huselton's conclusion as to the ultimate issue.

On June 18, 2013, Dr. Rexroat, a licensed psychologist, conducted a consultative examination (CE) of plaintiff at the request of the ALJ. (Tr. 499.) Subsequently, the ALJ accorded the CE's objective findings great weight. (Tr. 25.) Plaintiff argues the ALJ erred giving the CE opinion great weight because: (1) the CE developed his opinion on information gathered from plaintiff, a person with significant cognitive impairment; and (2) the CE diagnosis was that of depression, psychosis or borderline intelligence, which plaintiff claims are inconsistent and not found in the record. Further, plaintiff argues the ALJ erred in failing to evaluate the CE's opinion pursuant to 20 C.F.R. § 404.1527. (Id.)

The ALJ gave the appropriate weight to the CE opinion. The ALJ stated that plaintiff's subjective complaints to the CE were entitled to little weight, not being corroborated by the record, but CE's objective findings were entitled to great weight. (Tr. 24.)

The record shows that Dr. Rexroat performed several objective tests on plaintiff which assessed his cognitive functioning. (Tr. 500-01.) Therefore, contrary to plaintiff's assertions, Dr. Rexroat relied on objective testing and not information from a memory impaired individual in making his diagnosis. Further, Dr. Rexroat's diagnosis of depression, psychosis, or borderline intelligence is consistent with the rest of the record. During a May 25, 2012, doctor visit, plaintiff complained of depression (Tr. 268), but the

later consultative exam was the first time he complained of hallucinations. The ALJ rightfully disregarded the complaint of hallucinations because it was unsubstantiated by the record. Thus, the ALJ complied with 20 C.F.R. § 404.1527, by according great weight to the objective testing done and findings by Dr. Rexroat and not plaintiff's subjective complaints. Further, the borderline intelligence assessment was supported only by Dr. Rexroat's objective observation of plaintiff. The ALJ lawfully assessed great weight to the CE's findings.

**(2) Failure to properly consider all of plaintiff's severe impairments**

Plaintiff argues the ALJ failed to recognize plaintiff's tinnitus as a severe impairment. A severe impairment determination is the second step of the sequential five-step evaluation for disability. See 20 C.F.R. § 404.1520(a); see also Pate-Fires, 564 F.3d at 942 (describing five-step process). If the impairment does not significantly limit the claimant's physical or mental ability to do basic work activities, the claimant has not satisfied Step Two and the impairment is not severe. Kirby v. Astrue, 500 F.3d 705, 707 (8th Cir. 2007). Resting with the plaintiff, the burden to prove severity is not an onerous requirement, but neither is it unimportant. Id. at 708; see also Page v. Astrue, 484 F.3d 1040, 1043–44 (8th Cir. 2007); Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); Simmons v. Massanari, 264 F.3d 751, 755 (8th Cir. 2001); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997); Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996); Hudson v. Bowen, 870 F.2d 1392, 1395 (8th Cir. 1989).

Plaintiff argues the ALJ disregarded substantial evidence that showed tinnitus was a severe impairment. If substantial evidence supports the decision, courts are not required to reverse if inconsistent conclusions may be drawn from the same evidence. England v. Astrue, 490 F.3d 1017, 1019 (8th Cir. 2007). Plaintiff cites numerous sources in the record that show plaintiff had complained of tinnitus or a "buzzing" or "swooshing" sound in his ears. (Tr. 294, 302.) However, plaintiff failed to get caloric testing done which was recommended by ENT on April 8, 2013 in order to evaluate the tinnitus. (Tr. 657.) Additionally, plaintiff had a lengthy absence of reports of tinnitus

during doctor visits for other ailments between December 12, 2010 and May 25, 2012. (Tr. 210-67.) The evidence shows plaintiff failed to follow through on doctor recommendations to help find a cause in order to possibly reduce symptoms, and to explain inconsistent reports of the tinnitus.

Plaintiff contends his limitations from tinnitus included diminished concentration, persistence, or pace. The ALJ acknowledged these limitations from the CE's testimony and used them in his assessment of plaintiff's RFC. (Tr. 24, 501.) Regardless of the ALJ's determination at Step Two, all of the alleged impairments were considered. Therefore, the limitations induced by tinnitus would not have changed the ALJ's determination of work-related limitations.

Lastly, on March 27, 2013, plaintiff claims his tinnitus had resolved. (Tr. 451.) The court concludes that substantial evidence supports the ALJ's determination that tinnitus would not more than minimally affect his ability to perform basic work activities. Thus, it is not severe.

### (3) Considering failure to follow prescribed treatment

Plaintiff contends the ALJ wrongly found he was not compliant with prescribed treatment, because the ALJ failed to consider the relevant considerations set forth in SSR 82-59. Plaintiff argues SSR 82-59 requires the ALJ to determine whether the treatment at issue "is clearly expected to restore capacity to engage in any SGA."

> SSA may make a determination that an individual has failed to follow prescribed treatment only where all of the following conditions exist: 1. The evidence establishes that the individual's impairment precludes engaging in any substantial gainful activity (SGA) or, in the case of a disabled widow(er) that the impairment meets or equals the Listing of Impairments in Appendix 1 of Regulations No. 4, Subpart P; and 2. The impairment has lasted or is expected to last for 12 continuous months from onset of disability or is expected to result in death; and 3. Treatment which is clearly expected to restore capacity to engage in any SGA (or gainful activity, as appropriate) has been prescribed by a treating source; and 4. The evidence of record discloses that there has been refusal to follow prescribed treatment. Where SSA makes a determination of "failure," a

> determination must also be made as to whether or not failure to follow prescribed treatment is justifiable.

SSR 82-59, 1982 WL 374184, at *1 (1982). SSR 82-59 is not applicable here, because the ALJ did not consider failure to comply with prescribed treatment as it may relate to the restoration of plaintiff's ability to engage in SGA. Rather, the ALJ discussed both the recommended neuropsychiatric testing and the Tegretol medication in different contexts:

> [Plaintiff] did not undergo the recommended neuropsychiatric testing. He submitted multiple seizure questionnaires from friends and family dated April 2013, that are entitled to little weight in assessing his residual functional capacity (Exhibit 10F). These questionnaires are not consistent with [plaintiff's] inpatient treatment records documenting that Tegretol adequately controls his seizures, when he takes it appropriately (Exhibit 8F/51-52). The claimant has a history of noncompliance with Tegretol, despite his reports that he was taking the medication as prescribed, and he developed toxicity during his inpatient hospitalization when administered Tegretol, [plaintiff's] seizures were appropriately controlled. (*Id.*) The seizure questionnaires submitted by [plaintiff's] friends and family are entitled to little weight because they are not supported by post-discharge medical records documenting that the frequency and severity of [plaintiff's] seizures continued despite medication compliance (Exhibit 8F).

(Tr. 22.)

Another context involved the ALJ's consideration of Dr. Huselton's opinion that plaintiff's "memory impairment would likely impair [his] ability to maintain attention and concentration or to make work decisions." (Tr. 23.) Regarding this matter, the ALJ stated that '[plaintiff] has not undergone neuropsychiatric testing to determine the extent to which his memory is affected by his limbic encephalitis." (Id.) In another part of the written opinion, the ALJ referred to plaintiff's memory problems and again stated "but formal neuropsychiatric testing was not performed." (Tr. 24.)

The record supports the ALJ's decision in this regard. The treating physicians' reports indicate that, although plaintiff did not strictly follow the prescribed medications, there were still signs of improvement. (Tr. 281, 302.) Plaintiff's wife wrote in her questionnaire that plaintiff experienced two seizures on February 8 and 20, 2013. (Tr.

488.) However, during a March 7, 2013, visit to Dr. Patel, plaintiff's wife was noted as saying she or anyone else had not noted any seizures or any "episodes of waking up incontinent or with lip trauma." (Tr. 281.) Also, on March 18, 2013, Robert Bucelli M.D., noted that, "objectively. . . his seizures currently seem well controlled on Tegretol 200/400, and therefore it would be difficult to use seizure control as a surrogate marker for his VGKC disease." (Tr. 451.) In any event, contrary to plaintiff's argument, the record indicates that plaintiff's compliance with his prescribed medication therapy will control his severe impairment.

Further, while information may have been absent by lack of neuropsychiatric testing, other information was provided to the ALJ by the post-hearing psychological examination of plaintiff.

### (4) Contrary to the Weight of the Evidence

Plaintiff submitted additional evidence on December 11, 2013, after the hearing decision, but while the claim was still pending before the Appeals Council. Plaintiff claims the evidence was material to the outcome of the claim. The Appeals Council acknowledged receipt of the information, but denied review of the ALJ's decision. In pertinent part 20 C.F.R. § 404.970 provides,

> If new and material evidence is submitted . . . [t]he appeals council shall evaluate the entire record including the new and material evidence submitted if it relates to the period on or before the date of the administrative law judge hearing decision. It will then review the case if it finds that the administrative law judge's action, findings, or conclusions is contrary to the weight of the evidence currently of the record.

20 C.F.R. § 404.970. Critical to plaintiff's argument is his view that the additional evidence provides a lengthy list of evidence contradicting the ALJ's findings.

If the Appeals Council considers the new evidence and declines to review the case, the court reviews the ALJ's decision. Nelson v. Sullivan, 966 F.2d 363, 366 (8th Cir. 1992) (citing Browning v. Sullivan, 958 F.2d 817, 823 (8th Cir. 1992)). The court determines whether there is substantial evidence in the record as a whole, which now

includes the new evidence. Nelson, 966 F.2d at 366. The court must uphold the ALJ's decision if it remains supported by substantial evidence. Id. (citing McMillian v. Schweiker, 697 F.2d 215, 220 (8th Cir. 1983)).

Here, as in Nelson, the additional evidence submitted to the Appeals Council does not substantially detract from the substantial evidence the ALJ relied upon. Plaintiff contends the new evidence rebuts the ALJ's decision that, "there is nothing to suggest that [plaintiff's] history of limbic encephalitis and subsequent seizures will not resolve with appropriate treatment." (Tr. 25) To support his argument, plaintiff cites a note by Dr. Patel on May 21, 2013, which in summation states the improvements from treatment will not be clear for some time. (Tr. 586.) Further, plaintiff mentions Dr. Patel's July 25, 2013, assessment where he noted significant memory problems. (Tr. 524.) However, in the same July 25, 2013 report Dr. Patel notes there have been no episodes of seizure activity. (Id.) Further, on September 9, 2013, plaintiff's wife stated that plaintiff's memory had been getting better by stating that plaintiff "no longer wanders." (Tr. 512.) In addition, on the same September date, Dr. Patel opines plaintiff "is showing improvement in his objective testing for cognitive functioning." (Tr. 515.)

The court concludes that after reviewing the new evidence and taking into consideration the record as a whole, the ALJ's decision remains supported by substantial evidence.

## VI. CONCLUSION

For the reasons set forth above, the decision of the Commissioner of Social Security is affirmed. An appropriate Judgment Order is issued herewith.

/S/   David D. Noce
**UNITED STATES MAGISTRATE JUDGE**

Signed on September 20, 2016